**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CLYDE HUBERT LIPSCOMB,**

      **Plaintiff,**

v.                             **Case No.: 2:16-cv-11573**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 10, 11). For the following reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Defendant's Motion for Judgment on the Pleadings (ECF No. 10), **DENY** Plaintiff's Motion for Judgment on the Pleadings (ECF No. 7), **AFFIRM** the final decision of the

1

Commissioner, and **DISMISS** this action from the docket of the Court.

## I.    Procedural History

On October 7, 2013, Plaintiff, Clyde Hubert Lipscomb ("Claimant"), completed an application for DIB, alleging a disability onset date of September 13, 2013, due to "diabetes, bleeding of the eyes, heart issues, high blood pressure, high cholesterol, swelling of ankles and feet, poor circulation, tingling and numbness in legs and feet [and] hair loss on legs." (Tr. at 135, 158). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 95, 107). Claimant filed a request for an administrative hearing, which was held on August 11, 2015, before the Honorable Jon K. Johnson, Administrative Law Judge ("ALJ"). (Tr. at 25-42).  By written decision dated September 11, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-20). The ALJ's decision became the final decision of the Commissioner on October 5, 2016, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Both parties filed memoranda in support of judgment on the pleadings, (ECF Nos. 7, 10, 11); consequently, the issues are fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 61 years old at the time he filed the instant application for benefits, and 63 years old on the date of the ALJ's decision. (Tr. at 12). He has a high school education and communicates in English. (Tr. at 157, 159). Claimant's past relevant work includes a longstanding position as a coordinator and production line worker at a bedding

factory. (Tr. at 159-60).

### III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2018. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 13, 2013, the alleged onset of disability. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "diabetes mellitus with mild retinopathy, ischemic heart disease (coronary artery disease), obesity, and sensorineural hearing loss in the frequency range of 500-4000Hz (20 CFR 404.1520(c))." (Tr. at 14, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-16, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can perform all of the postural activities occasionally. He should also avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, gases, poor ventilation, and hazards.

(Tr. at 16-19, Finding No. 5). At the fourth step, with the assistance of a vocational expert ("VE"), the ALJ determined that Claimant was able to perform his past relevant work as a mattress supervisor/coordinator. (Tr. at 19, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. 19, Finding No. 7).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant asserts one challenge to the Commissioner's decision. He claims that the ALJ erred by failing to include limitations in the RFC finding that accounted for the effects of Claimant's visual and hearing impairments. Claimant argues that he has documented retinopathy and sensorineural hearing loss, yet the ALJ never considered the functional effects of these impairments, nor explained why he chose not to include limitations in the RFC finding related to them.

In response, the Commissioner contends that Claimant fails to offer a legitimate challenge to the disability decision. Instead, Claimant asks the Court to re-weigh the evidence, which is a request the Court should decline to consider. The Commissioner posits that the ALJ assessed Claimant's visual and hearing loss, but did not feel that Claimant had significant functional limitations as a result of these conditions. According to the Commissioner, the ALJ also provided sound and logical reasons for concluding that additional restrictions were not required, pointing out the ALJ's comments that Claimant seemed to hear well during the administrative hearing and only occasionally used reading glasses.

In reply, Claimant indicates that the ALJ's personal observations regarding Claimant's hearing and vision were not dispositive of the issue. Claimant emphasizes that his hearing loss prevents him from hearing well in noisy surroundings; consequently,

basing the RFC finding on how well Claimant could hear in a quiet setting was improper. Claimant reiterates that the ALJ's analysis and discussion of Claimant's hearing and vision losses were inadequate, leaving the court and parties to guess how the ALJ reached his decisions.

## V.    Relevant Evidence

While the undersigned has reviewed all evidence of record, only the notations most relevant to the disputed issues are summarized below:

### A. Treatment Records

Four years before the alleged disability onset, on July 9, 2009, Claimant presented to R. Mark Hatfield, M.D., for the purpose of a retinal consultation. (Tr. at 242-44). Claimant complained of blurred vision in the left eye that developed one month earlier. He felt the blurriness worsened as the day progressed, and he had not noticed any significant improvement over the month. His right eye was described as stable. Claimant had a medical history of bilateral photocoagulation of the eyes in 2006; hypertension; and Type II diabetes mellitus. On examination, Claimant's external ocular and anterior segment findings were unremarkable, except for the presence of a 1+ nuclear sclerotic cataract in both eyes. His retinal examination revealed a 2+ diffuse vitreous hemorrhage in the left eye and old scars in both eyes, without anterior tears or detachments. His visual acuity in the right eye was 20/25 and was 20/50-2 in the left eye. Dr. Hatfield diagnosed Claimant with proliferative diabetic retinopathy with recurrent vitreous hemorrhage of the left eye; history of bilateral panretinal photocoagulation treatment; history of focal treatment for diabetic maculopathy of the right eye; Type II diabetes; hypertension; and negative cardiovascular history. Claimant was instructed to return in four to six weeks. He was advised that if a recurrent hemorrhage or non-clearing hemorrhage occurred,

Claimant should consider vitreous surgery.

Claimant returned to Dr. Hatfield on October 7, 2010. (Tr. at 245-46). Claimant reported that his vision had remained "relatively stable." Following his prior ocular examination, Claimant developed a small bleed in the left eye that subsequently resolved. Dr. Hatfield measured Claimant's visual acuity in the right eye at 20/20 and at 20/40-2 in the left eye. A retinal examination of the right and left eyes was unremarkable as to the disc and vasculature. However, Claimant's left eye revealed cellophane changes without clinically significant macular edema, although panretinal treatment was seen throughout the peripheral fields with an old hemorrhage in the vitreous base. Dr. Hatfield assessed Claimant with non-proliferative retinopathy, status-post panretinal treatment with long-term stability of the left eye, and mild nuclear sclerotic cataracts in both eyes. Claimant was advised to return the following year or sooner if he developed significant or recurrent hemorrhages in the left eye.

In 2011, Claimant saw his family physician, Dr. John Connor, on four occasions for treatment of diabetes mellitus, hyperlipidemia, and hypertension: January 3, May 3, July 21, and September 13. (Tr. at 359-60, 364, 367-73). Dr. Connor recorded that, overall, Claimant was feeling well. His diabetes mellitus was without complication and well controlled with medication. Claimant was also taking medication for treatment of hypertension and hyperlipidemia, as prescribed, in addition to following dietary guidelines. Both conditions remained stable. At each visit, Dr. Connor noted that Claimant was able to articulate well with normal speech, language, rate, volume and coherence.

Claimant returned to Dr. Connor on January 13, May 25, and November 30, 2012 for a recheck of diabetes mellitus. (Tr. at 345-47, 350-52, 355-57). In January, Claimant's

laboratory results were much improved; his blood pressure was well controlled; and Claimant was feeling well. He was also stable in May. However, in November, Claimant's laboratory results were not as good, so Claimant was told to work harder on adhering to his diet and to become more active. On all three occasions, Dr. Conner documented that Claimant was able to articulate well with normal speech, language, rate, volume and coherence.

Claimant presented to Dr. Ronald Frame, an ophthalmologist, on April 17, 2013. (Tr. at 291-92). Claimant complained of vision issues that were worsening, particularly in the left eye, and described seeing floaters and flashers. Claimant told Dr. Frame that nothing seemed to help with these issues; however, Claimant denied any pain, diplopia, photophobia, discharge, dryness, redness, soreness, or itching. At that time, Claimant wore eyeglasses only for reading. His visual acuity without correction was 20/25 in the right eye and 20/40 in the left eye, with pinhole acuity in the left eye of 20/25. A lens examination of both eyes revealed +2 nuclear sclerotic cataracts and +1 posterior subcapsular cataracts. A dilated fundus examination revealed mild macular epiretinal membrane, left eye greater than the right eye, dot/blot hemorrhages and microaneurysms, as well as panretinal photocoagulation in both eyes. Dr. Frame diagnosed Claimant with combined cataracts, combined senile; Type II diabetes mellitus with eye manifest, controlled; mild non-proliferative diabetic retinopathy; early stages of degenerative condition of the retina due to diabetes mellitus; epiretinal membrane macular puckering; and preretinal fibrosis. Dr. Frame explained to Claimant the need to keep tight control of his blood sugar.

Claimant returned to Dr. Connor twice in 2013: June 27 and July 8. (Tr. at 340-44). At the June 27 visit, Claimant's diabetes mellitus had worsened slightly; however,

both hypertension and hyperlipidemia appeared stable and controlled with medications. Claimant was advised to try being more active and pay attention to his diet. By July 8, Claimant's diabetes mellitus was stabilizing. Although Claimant reported being more active, he was still having trouble adhering to the diabetic diet. On examination, Claimant weighed three hundred five pounds with a blood pressure of 130/90. Claimant reported he felt well, and Dr. Connor noted Claimant was able to articulate well with normal speech, language, rate, volume and coherence.

Claimant returned to Dr. Connor's office on January 10, 2014 reporting that he was feeling well and doing better with adhering to his diet. (Tr. at 407-10). Claimant had lost ten pounds, was taking his medication as prescribed and had no episodes of hypoglycemia. A physical examination was unremarkable other than trace edema in the lower extremities. Claimant was assessed with diabetes mellitus, hypertension, and hyperlipidemia, all in stable condition. His condition remained stable at his next visit on February 4, 2014 and at the following visit on February 18, 2014. (Tr. at 404-05, 424-25). He was noted on each visit to articulate well, with normal speech, language, rate, volume and coherence.

On January 22, 2014, Claimant presented to Anil K. Singh, M.D., at the Digestive Care Center for transition of medical care. (Tr. at 253-54). Dr. Singh noted Claimant felt "well with minor complaints." The physical examination was unremarkable, and Claimant was directed to schedule a screening colonoscopy.

On March 27, 2014, Claimant presented to Mirza Hamirani, M.D., at Mid-Ohio Valley Nephrology Associates, upon a referral from Dr. Connor. (Tr. at 462-65). Claimant's medical history included type II diabetes; diabetic retinopathy; status-post laser surgery; hypertension; coronary artery disease, status post percutaneous coronary

intervention; atrial fibrillation; acute renal failure; and Stage I kidney disease. On a review of systems, Claimant denied having blurry vision, hearing loss, tinnitus, vertigo, imbalance, or diplopia. Claimant was assessed with Stage I chronic kidney disease, essential hypertension, and type II diabetes.

Claimant returned to Dr. Connor on April 18, 2014. (Tr. at 454-56). At that time, Claimant's blood pressure was controlled and he was feeling good. Claimant was able to articulate well with normal speech, rate, volume and coherence.

On April 23, 2014, Claimant presented to Dr. Frame with complaints of painless, progressively worsening and gradually decreasing vision in both eyes, described as "foggy," with floaters and flashes of light, worse in the left eye. (Tr. at 293-94). Claimant wore eyeglasses for reading only and, without correction, his visual acuity was 20/30 in the right eye and 20/40+2 in the left eye. Pinhole acuity was no better in the left eye. Claimant's nuclear sclerotic cataracts had progressed some to +2-3, and the posterior subcapsular cataracts were still +1 in both eyes. Claimant was assessed with suspected pre-glaucoma; diabetes mellitus type II, or unspecified type, that is controlled with eye manifest; mild non-proliferative diabetic retinopathy; early stages of degenerative condition of the retina due to diabetes mellitus; epiretinal membrane macular puckering; preretinal fibrosis; and combined cataract. Claimant was again advised of the effects of diabetes on vision and was encouraged to keep tight control of his blood sugar.

Claimant returned to Dr. Connor on July 11, 2014. (Tr. at 450-53). Claimant reported he had improved in adhering to his diet and had not had any episodes of hypoglycemia. Claimant's diabetes, hypertension, and hyperlipidemia were stable and controlled with medication.

On July 14, 2014, Claimant presented to Dr. Frame with complaints of progressive decrease in vision that was worsening but did not cause any pain. (Tr. at 295-96). On examination, Claimant's intraocular pressure was much better. The Humphrey visual field was equivocal due to extensive laser treatment. The cup-to-disc ratio measuring 0.2/0.2 in both eyes was not an indication of glaucoma damage, so Dr. Frame decided to monitor Claimant's intraocular pressure closely. Claimant's diagnosis was unchanged from his last visit.

Claimant saw Dr. Hamirani on September 25, 2014. (Tr. at 484—86). On a review of systems, Claimant denied having blurry vision, hearing loss, tinnitus, vertigo, imbalance, or diplopia. His physical examination was unremarkable. Examination of the ear auditory canals revealed that his tympanic membranes were mobile with landmarks and light reflexes intact. Claimant's diabetes mellitus and blood pressure remained stable.

Claimant returned to Dr. Connor twice more in 2014: November 5 and November 11. (Tr. at 438-43). Claimant was following the diabetic diet and his conditions remained stable and well controlled. Claimant was advised to continue with his medication regimen. Claimant also had three visits in 2014 with Dr. Hermant Modi, a cardiologist. At all three visits, Claimant denied having blurred vision. (Tr. at 301, 306, 308, 326, 330, 335).

On January 14, 2015, Claimant presented to Dr. Frame for an eye pressure examination. (Tr. at 473-74, 572-74). Claimant's visual acuity without correction was 20/30 in the right eye and 20-40+2 in the left eye. Based upon the intraocular pressure results, Claimant was assessed with borderline glaucoma, low risk; type II diabetes mellitus with ophthalmic manifestations; mild non-proliferative diabetic retinopathy; and epiretinal membrane puckering of the retina. Claimant was again cautioned to keep tight control of his blood sugar.

Claimant returned to Mid-Ohio Valley Medical Group for an appointment with Dr. Connor on February 12, 2015. (Tr. at 527-29). Dr. Connor noted that Claimant had done a good job with losing weight and with exercise. A review of systems was negative. Claimant articulated well with normal speech, rate, volume, and coherence. Claimant was assessed with diabetes mellitus, dyslipidemia, and hypertension, all in stable condition. Claimant was advised to continue his current medication regimen. Laboratory results taken on March 20, 2015 confirmed that Claimant's chronic conditions were stable. (Tr. at 520-25).

Claimant saw Dr. Modi on March 12, 2015. (Tr. at 477-78). He denied having blurred vision and was diagnosed with chronic cardiac conditions. Claimant also returned to Dr. Hamirani on March 25, 2015. (Tr. at 487-89, 550-52). Claimant again denied having blurry vision, hearing loss, tinnitus, vertigo, imbalance, or diplopia. He was advised to return in six months.

Claimant presented to Dr. Connor twice more in 2015: May 8 and May 15. (Tr. at 560-67). Claimant was doing well with weight loss and exercise. His conditions of diabetes mellitus, hypertension, and hyperlipidemia were stable and controlled with medication. Although Claimant was not following the diet plan, his recent laboratory results were within normal limits. Claimant exhibited normal speech, rate, volume and coherence. A review of systems was negative. Claimant was counseled about his diet and advised to continue his medication regimen. Later that month, on May 26, 2105, Claimant completed a Patient Information Form for Mountain River Physical Therapy. (Tr. at 535-36). When asked to review a list of symptoms and check those he had recently experienced, Claimant did **not** select blurred or double vision. (Tr. at 536).

12

Claimant returned to Dr. Frame's office on July 22, 2015. (Tr. at 575-77). Claimant continued to complain of gradual decreased vision that was painless, but progressive. In addition, Claimant complained of blind spots, loss of side vision, floaters, flashes of light, (worse in left eye),  light sensitivity, red eye, eye pain and soreness (in both eyes), but did not report any blurred vision, loss of vision, double vision, or bending of straight lines. His visual acuity, uncorrected, was 20/25+2 in the right eye and 20/40+2 in the left eye. He still used only over-the-counter "readers" for correction. Claimant was assessed with suspected glaucoma open angle with borderline glaucoma findings, low risk; diabetes mellitus, type II with ophthalmic manifestations, not stated as uncontrolled; mild non-proliferative diabetic retinopathy; and epiretinal membrane puckering of the retina. Claimant was again advised as to the effects of diabetes on vision and that he needed to keep tight control of his blood sugar.

### B. Evaluations and Opinions

On October 9, 2012, Claimant presented to the Veterans' Affairs ("VA") Medical Center for a compensation and pension examination in connection with complaints of tinnitus and hearing loss. (Tr. at 230-39). Doreen Maurer, audiologist, tested all frequencies of Claimant's hearing and determined that the test results were valid for VA disability rating purposes. Claimant was found to have sensorineural hearing loss in both ears in the frequency range of 500-4000Hz and tinnitus. However, Ms. Maurer did not find Claimant's hearing loss to be of a severity level sufficient to constitute a disability under the VA standard. She added that his hearing loss and tinnitus were not likely to be related to his military service. When asked, Claimant reported that his hearing loss and tinnitus had an impact his daily life, including his ability to work. He stated that he thought he could hear "alright," but his co-workers felt he could not hear well even when

people spoke loudly to him. Claimant described his tinnitus as a "ringing all the time," but indicated that he had "learned to live with it like pain you just deal with it." (Tr. at 238).

On November 19, 2013, Sushil M. Sethi, M.D., performed an examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 247-249). With respect to his vision and hearing, Claimant reported that he had diabetes, which caused bleeding of the eyes and hearing loss. He stated that approximately four years earlier, he had received multiple laser treatments for bleeding in both eyes. Claimant reported having eyeglasses, but he did not bring them to the appointment. Dr. Sethi confirmed that Claimant had an unrestricted driver's license and was able to drive. When asked about his hearing loss, Claimant indicated that the problem started ten years earlier, but had not required the use of hearing aids. Dr. Sethi observed that Claimant "was able to communicate very well...his speech was normal and he was able to hear [Dr. Sethi] without [Dr. Sethi] having to speak louder." (Tr. at 247).

On examination, Claimant's uncorrected visual acuity was 20/50 in the right eye and 20/70 in the left eye. His pupils were equal, regular, and reactive to light and accommodation. Claimant had no obvious physical abnormalities of the eyes and ears. Dr. Sethi diagnosed Claimant with diabetes and a history of diabetic retinopathy; remote history of heart attack with a single stent placement; history of possible angioplasty; stent replacement in the left iliac artery; and hypertension without heart failure. Dr. Sethi opined that Claimant's ability to work at physical activities might be slightly affected; however, his hearing, speaking, and ability to travel were normal.

On December 11, 2013, Atiya M. Lateef, M.D., completed a physical residual functional capacity evaluation. (Tr. at 78-80). Dr. Lateef determined that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds;

14

stand, walk or sit approximately six hours in an eight-hour workday; and had unlimited ability to push and/or pull with the attached lift and/or carry restrictions. Claimant could occasionally perform all postural activities, including climbing ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl. Claimant had no manipulative, visual, or communicative limitations. As to environmental limitations, Claimant had unlimited ability for exposure to wetness, humidity, noise, and vibration; however, he was told to avoid concentrated exposure to extreme cold, heat, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery or heights. On January 23, 2014, Rogelio Lim, M.D., completed a physical residual functional capacity assessment. He reviewed Dr. Lateef's evaluation, along with the record, and agreed with Dr. Lateef's conclusions. (Tr. at 87-89).

### C. Claimant's Statements

In an October 2013 adult function report, Claimant stated that he had hearing and vision loss. (Tr. at 168). However, Claimant admitted that he could watch television, read the newspaper, do all of his own lawn and household chores, make simple meals, drive a car, handle money, and shop in the grocery store once per week. (Tr. at 168-72). He stated that he wore reading glasses when he read, but denied having hearing aids. (Tr. at 174).

In January 2014, Claimant provided a second adult function report. (Tr. at 189-96). Claimant reiterated that he had vision and hearing loss; however, he continued to watch television, make simple meals, do yard and house work, drive, go to the grocery store, and handle money. (*Id.*) Claimant used reading glasses to read and count money, but did not have hearing aids. According to Claimant, his vision was worse in the dark. He claimed to have had bleeding in his eyes that reduced his vision in the left eye by 90% and in the right eye by 60%. (Tr. at 196).

At the administrative hearing on August 11, 2015, Claimant was not wearing glasses and testified that he only wore them to read. (Tr. at 29-30). He admitted that he continued to drive, and his driver's license was unrestricted. Claimant stated that he last work as a coordinator in a bedding plant, but quit working when the plant closed down. (Tr. at 31). Claimant testified that he had trouble doing his job during the last few years, because of his eyesight; specifically, he developed floaters, swelling, and reduced visual acuity. With respect to his hearing, Claimant indicated that he had some trouble hearing the ALJ, because he had ringing in his ears, as well as hearing loss that he attributed to working in a noisy bedding factory. (Tr. at 35). Claimant felt the loss was more pronounced when in the presence of background noise. Nevertheless, Claimant testified that he lived alone and did all of the household chores. (Tr. at 36). He also exercised three times a week at Planet Fitness. (Tr. at 38).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.

2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  **Discussion**

Claimant argues that the ALJ erred by failing to include limitations in the RFC finding to account for his vision and hearing losses. In addition, Claimant contends that the ALJ did not provide an adequate explanation for why he felt additional limitations were unnecessary. According to Claimant, the ALJ's "selective parsing" of the medical records does not satisfy the function-by-function analysis required by Fourth Circuit precedent. (ECF No. 11 at 3).

In determining Claimant's RFC, the ALJ considered the evidence regarding Claimant's eyesight and hearing. (Tr. at 17-19). The ALJ noted that Claimant testified about having an increase of floaters in his eyes, which reduced his vision. At the same time, the ALJ pointed out that Claimant was not wearing eyeglasses and testified that he only wore them to read. Claimant admitted that he was able to drive and his license had no restrictions. Claimant also testified that he had ringing in his ears and difficulty hearing in the presence of background noise, yet the ALJ observed that Claimant was able to "hear fine" at the administrative hearing. (Tr. at 17).

Reviewing the pertinent treatment records and comparing them to Claimant's statements, the ALJ did not find Claimant's statements to convey a fully accurate picture of his vision and hearing losses. (*Id.*). The ALJ indicated that records from Dr. Sethi's office confirmed that Claimant's visual acuity was 20/50 in the right eye and 20/70 in the

left eye, without correction, while records from Dr. Frame, Claimant's treating ophthalmologist, revealed that Claimant's vision without correction was 20/25 in the right eye and 20/40 in the left eye. (Tr. at 17-18). In regard to Claimant's hearing, the ALJ acknowledged that Claimant had bilateral sensorineural hearing loss in the frequency range of 500-4000Hz, but was documented as communicating well with Dr. Sethi. Dr. Sethi mentioned that Claimant had normal speech and was able to hear without Dr. Sethi having to speak in louder tones. (Tr. at 18). Moreover, Claimant appeared to hear well during the administrative proceeding. The ALJ additionally considered the opinion evidence supplied by agency consultants, Dr. Lateef and Dr. Lim. Neither expert found Claimant to have visual or communicative limitations and recommended only that Claimant avoid concentrated exposure to hazards.

Contrary to Claimant's contention, the ALJ did conduct a function-by-function analysis and provided an explanation for his decision not to include vision and hearing restrictions in the RFC finding. The ALJ simply did not believe that Claimant's vision and hearing losses were sufficiently severe to result in work-related limitations. In support of his conclusion, the ALJ relied on treatment records that demonstrated Claimant's visual acuity to be good, his dependence on glasses to be minimal, and his hearing during everyday encounters to be entirely normal. Furthermore, the ALJ had an opportunity during the administrative hearing to personally gauge the effect of Claimant's hearing loss, which the ALJ found to be minimal, and to confirm that Claimant did not regularly wear eyeglasses.

Claimant suggests that the ALJ should have included vision and hearing limitations in the RFC finding, because he determined that Claimant's "mild retinopathy" and "sensorineural hearing loss" were severe impairments. However, an ALJ is "not

18

required to separately include limitations from each of [a claimant's] step two severe impairments when assessing his RFC." *Chappell v. Colvin*, No. 1:10CV384, 2014 WL 509150, at *4 (M.D.N.C. Feb. 7, 2014). As the Court in *Chappell* explains, such a suggestion "misinterprets the relationship between a step two finding of severity and the ALJ's later assessment of Plaintiff's RFC." *Id.* ("The determination of a 'severe' impairment at step two of the sequential evaluation process is a *de minimis* test, designed to weed out unmeritorious claims. A finding of *de minimis* limitations is not proof that the same limitations have the greater significant and specific nature required to gain their inclusion in an RFC assessment at step four.") (quoting *Hughes v. Astrue*, No. 1:09CV459, 2011 WL 4459097, at *10 (W.D.N.C. Sept. 26, 2011) (internal citations omitted)).

Although the ALJ's explanation is succinct, it clearly conveys the reasons for his decision not to include hearing and vision restrictions in the RFC finding. Unlike the situations in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) and *Monroe v. Colvin*, 826 F.3d 176 (4th Cir 2016), this court is not "left to guess about how the ALJ arrived at his conclusions" regarding the effect of Claimant's vision and hearing losses on his ability to do basic work activities. *See Mascio*, 780 F.3d at 637. Indeed, the ALJ's explanation creates an "accurate and logical bridge from the evidence to his conclusion." *Monroe*, 826 F.3d at 189.

Furthermore, the ALJ's decision is supported by substantial evidence. To begin, there are no notations in any of the clinical records corroborating that Claimant has difficulty hearing normal conversations. Even testing records from the VA Medical Center, which diagnosed Claimant's hearing loss, reflected a loss that was not at the level of severity considered to be a disability for VA purposes. (Tr. at 234). The only functional impact of Claimant's hearing loss was self-described. Claimant referenced having a

hearing test at work, which allegedly documented a significant hearing loss; however, Claimant disagreed with the results, stating that he heard "alright." (Tr. at 236). Moreover, Dr. Sethi performed a consultative examination of Claimant and observed his ability to interact with others. Dr. Sethi found no evidence of significant hearing loss, opining to the contrary that Claimant's hearing was "normal." (Tr. at 249). In addition, Claimant's family doctor, Dr. Conner, repeatedly documented that Claimant could "articulate well with normal speech/language, rate, volume and coherence." (Tr. at 341, 346, 351, 356, 405, 425, 452, 455, 528, 562). Dr. Connor never remarked in the clinical notes that Claimant had a noticeable hearing loss, nor did he include hearing loss in the list of Claimant's diagnoses. (Tr. at 337-38, 518, 559). Claimant was never treated for hearing loss, nor did he wear hearing aids. While he also stated he had chronic ringing in his ears, he added that he had "learned to live with it like pain you just deal with it." (Tr. at 238). Finally, the ALJ did not notice Claimant having major difficulty hearing the proceedings, and the non-examining consultative experts determined that Claimant had no visual or communicative limitations.

The evidence pertaining to Claimant's eyesight likewise corroborates little functional impact related to Claimant's vision defects. Claimant's *uncorrected* vision was measured by Dr. Frame to be 20/25 in the right eye and 20/40+2 in the left eye. Dr. Frame did not prescribe eyeglasses, noting that Claimant used only over-the-counter reading glasses when necessary. Despite claiming that his vision was hazy or foggy, Claimant drove regularly, watched television, and read. Claimant points to evidence of macular puckering, arguing that such a condition "can cause blurred and distorted central vision." (ECF No. 7 at 9). While that may be true, Claimant did not demonstrate blurred and distorted vision when tested by the expert, Dr. Frame. Similarly, Claimant denied having

20

blurred or double vision on multiple occasions. (Tr. at 301, 306, 308, 463, 484, 487, 536, 550). Had Claimant's vision been as dramatically affected as he claimed, he simply would not have denied these symptoms.

In summary, Claimant contends that the ALJ failed to adequately analyze and weigh the evidence regarding his vision and hearing losses and failed to explain his reasons for not including visual and hearing limitations in the RFC finding. This contention is without merit. With the exception of Claimant's statements, the evidence consistently shows that, despite having diagnosed hearing loss and vision changes related to diabetes, Claimant is not significantly hindered by these impairments in his ability to perform basic work functions. The ALJ resolved the conflict between Claimant's statements and the other evidence and explained his reasoning, referring to specific parts of the record. Therefore, the undersigned **FINDS** that the ALJ did not err in his assessment or explanation of Claimant's hearing and vision losses and their functional effects, or in the determining the RFC finding.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 7), **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 10), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: August 30, 2017

Cheryl A. Eifert
United States Magistrate Judge